O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHRISTOPHER MILES H.,

             Plaintiff,

   v.

ANDREW M. SAUL, Commissioner of Social Security,[1]

             Defendant.

Case No. 2:18-cv-02213-KES

MEMORANDUM OPINION AND ORDER

**I.**

**BACKGROUND**

Plaintiff Christopher Miles H. ("Plaintiff") applied for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits in 2016, alleging disability commencing October 1, 2015. Administrative Record ("AR") 177-87. On May 17, 2017, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by an attorney, appeared and testified, as did a vocational expert ("VE"). AR 31-77. On August

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

28, 2017, the ALJ issued an unfavorable decision. AR 18-30. The ALJ found that Plaintiff suffered from severe bipolar disorder. AR 25. Despite this impairment, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to work at all exertional levels if "limited to simple routine tasks; to occasional public contact; occasionally able to tolerate and adapt to changes in a work setting; cannot be around or work with ladders, ropes or scaffolds, moving mechanical parts, or unprotected heights; occasional climbing of ramps and stairs." AR 25-26.

Based on the RFC analysis and the VE's testimony, the ALJ found that Plaintiff could not perform his past relevant work as a composer, music copyist, or disc jockey. AR 18, 26. The ALJ, however, found that Plaintiff could work as a nut and bold assembler (Dictionary of Occupational Titles ["DOT"] 929.587-010), garment folder (DOT 789.687-066), and hand packager (DOT 920.587-018). AR 26, 69. The ALJ concluded that Plaintiff was not disabled. AR 26.

## II.

### ISSUES PRESENTED

Issue One: "Whether the ALJ properly considered [Plaintiff's] bipolar condition."

Issue Two: Whether the ALJ's RFC determination is supported by substantial evidence.

Issue Three: Whether the ALJ gave legally sufficient reasons for rejecting lay testimony.

Issue Four: Whether the ALJ's finding that Plaintiff could perform a significant number of jobs on a sustained basis is supported by substantial evidence.

(Dkt. 36, Joint Stipulation ["JS"] at 6.)

### III.

### SUMMARY OF RELEVANT ADMINISTRATIVE PROCEEDINGS

Because the much of the same evidence is relevant to each issue, the Court

summarizes the evidence and administrative findings globally rather than issue-by-issue.

**A. <u>Medical Evidence.</u>**

    **1. Summary.**

Plaintiff was admitted to Heritage Oaks Hospital in Sacramento on November 17, 2015 complaining of severe depression and suicidal thoughts after the death of his mother. AR 43, 268, 332. He was "[s]tabilized eventually on a combination of medications, Seroquel and Depakote, targeting depressed mood, significant anxiety." AR 269. The hospital noted that he "tolerated these medications well" but with a "degree of sedation." AR 269, 285. Plaintiff, however, reported serious side effects. AR 282, 285, 289. He was discharged on December 11, 2015, at which time he still reported "feeling nervous." AR 268-69.

Upon discharge, Plaintiff returned to Los Angeles and interviewed with social worker Carlos Juarez of the Northeast Mental Health Clinic. AR 304-05. He told Mr. Juarez that he had "not maintained a stable job throughout his adult life. [He spent] his past earnings on Heroin." AR 310. He started using heroin at the end of his college years and stopped in June 2010. AR 314, 333.

Through the clinic, he began treating with psychiatrist Dr. Khatera Ghazanfar. AR 299-303, 329. In February 2016, he reported patterns of manic episodes lasting up to four days followed by a "crash[]" into depression lasting up to two weeks. AR 332. His treatment goal was to decrease his depressive symptoms from seven to four times a week over the course of six to twelve months. AR 408.

In March 2016, Dr. Ghazanfar changed some of his medications, dropping Depakote due to unacceptable gastrointestinal side effects, causing Plaintiff to report a "hard month" with "moderate to severe levels of anxiety" and "passive" thoughts of suicide. AR 324, 332, 335.

In April 2016, Dr. Ghazanfar completed a questionnaire. AR 299-303. She

opined that Plaintiff could take care of his basic hygiene needs, pay bills, use public transportation, and interact appropriately with others at the sober living facility where he resided. AR 301-02. She observed that he sustained focus during their appointments, but she was unsure whether he could adapt to common workplace stressors. AR 302. She identified his current medications as Seroquel and Latuda, both antipsychotic drugs, to which he had only a "fair" response. AR 303. She expected his condition to improve over twelve months with medication compliance. Id.

In June 2016, Plaintiff told the Los Angeles County Department of Mental Health that his bipolar disorder made it difficult for him to get out of bed, perform basic self-care, and conduct activities of daily living. AR 366. Registered nurse ("RN") Claudia Upshur opined that his psychiatric symptoms would likely interfere with him completing an eight-hour workday, maintaining the expected work pace, and interacting with others. AR 367.

Plaintiff visited the Exodus Recovery Urgent Care Center ("Exodus") in January, June, and July 2016, where he received psychiatric evaluation and medication. AR 448. In January, Plaintiff reported feeling slightly manic with racing thoughts.[2] AR 461. In June, Exodus prescribed Celexa, an antidepressant, and advised of its many potential side effects, including drowsiness and dizziness. AR 455. In July, Plaintiff reported a stable mood with a slight increase in anxiety after a medication change. AR 449. The only medication side effect he reported at that time was "mild constipation." Id.

In July 2016, Plaintiff also underwent a consultative evaluation by clinical psychologist Dr. Rashin D'Angelo. AR 465. Plaintiff described his living arrangements at the sober living facility where he did some household chores,

---

[2] He later told Dr. Ghazanfar that he had visited urgent care because he felt "very depressed." AR 486.

4

performed basic self-care, and managed his own money. AR 466-67. He was focused and cooperative throughout the appointment, but his mood was visibly "anxious and labile." AR 467. He exhibited "flight of ideas and racing thoughts." Id. Dr. D'Angelo opined that Plaintiff would have "no limitations performing simple or repetitive tasks … on a consistent basis without special or additional supervision." AR 468. Nevertheless, Plaintiff "would have mild limitations completing a normal workday or workweek due to his mental condition." Id. He would also have mild difficulties interacting with others and moderate difficulties handling the usual stress of gainful employment. AR 468-69.

In August 2016, Plaintiff reported that the Celexa was making him "more nervous and manicky." AR 475. He continued to be "very depressed." Id. Dr. Ghazanfar devised a plan for him to taper off Celexa and start a trial of Lamictal. AR 477.

In September 2016, Plaintiff complained to Dr. Ghazanfar that the Lamictal was making him "really tired," but he denied other medication side effects. AR 470. Despite his medications, he continued to feel "nervous and manic." Id. He was struggling with activities of daily living and had "wishful thoughts of death." Id. His impulse control was "severely impaired" and his judgment "poor." AR 471.

In November 2016, Plaintiff believed that his depression had "gotten worse." AR 549. He felt "really depressed" and "hopeless." AR 561. He was struggling with a medication adjustment. AR 564. His treatment goal was to decrease his depression to a rating of five on a scale of one to ten. AR 568.

In January 2017, after a housing move, Plaintiff reported increased anxiety and a depressed mood. AR 527. A week later, however, Plaintiff reported a decrease in his symptoms and feeling some hope. AR 522. In February 2017, he reported feeling "depressed and too medicated." AR 513.

In March 2017, Dr. Ghazanfar completed another RFC assessment. AR

5

505-12.  She opined that while Plaintiff's ability to carry out short, simple instructions was not significantly limited, he had moderate limitations sustaining a routine without special supervision and marked limitations completing a normal workday or workweek.  AR 505.  She further opined that while he was only moderately limited in the area of social interactions, he was markedly limited in his ability to tolerate stress in ordinary work situations.  AR 506.  His condition caused lethargy that made it difficult for him to complete tasks, including activities of daily living.  AR 510-11.  She opined that Plaintiff could not "respond appropriately" to work pressures then, but she expected "a fair amount of improvement" over the next 12-18 months.  AR 512.

At the hearing in May 2017, Plaintiff testified that he was seeing Dr. Ghazanfar every two months for medication management and Dr. Evelyn Caracciolo Magcalas weekly for psychotherapy.  AR 37.  He felt that he could not work because he became "confused" when dealing with any type of pressure.  AR 49.  He reported getting "mixed up" when trying to do something as simple as cooking, and his confusion triggered anxiety and panic attacks.  AR 50, 55.  His medications caused him to suffer dizziness, nausea, and diarrhea.  AR 52-53.  He was drowsy to the point of falling asleep while reading or watching television.  AR 58.  He estimated that he thought about suicide four to six times a month.  AR 56.

### 2.  The ALJ's Evaluation of the Medical Evidence.

The ALJ began her analysis by noting that prior to his month-long, voluntary hospitalization in late 2015, Plaintiff had never sought treatment for mental illness, although he had abused heroine to mask symptoms of depression.  AR 20.  The ALJ characterized Plaintiff's post-hospitalization records as showing that his symptoms had "improved" and he was "adjusting well to medications."  AR 21.

The ALJ characterized records from the Los Angeles County Mental Health Services through mid-2016 as "devoid of objective data" and "conclusory."  AR 21-22.  Plaintiff had a Global Assessment of Functioning ("GAF") score of 50, an

improvement from the GAF score of 35 assessed during his hospitalization. AR 21. The ALJ noted that multiple treating sources described Plaintiff as having poor impulse control, but those findings were "not well explained" since they were coupled with observations that Plaintiff was "pleasant and cooperative."[3] AR 22.

The ALJ stated that she considered Plaintiff's "allegations regarding medication side effects" in determining his RFC. AR 19. After his discharge from the hospital in December 2015, however, she found little in his medical records "in the way of complaints of medication side effects." AR 22.

The ALJ characterized Plaintiff's medical records following May 2016 as showing "improvement and stability." AR 22. She cited the Exodus record from July 2016 discussing "mild constipation" as his only medication side effect. Id., citing AR 449.[4] The ALJ then found that Plaintiff had experienced no changes for the worse since July 2016. AR 23.

The ALJ summarized the treating notes of psychotherapist Dr. Caracciolo Magcalas, noting that they included complaints of medication side effects (such as fatigue) and declining cognitive functioning (compared to Plaintiff's history of composing music). Id. The ALJ characterized these records as showing "progress" but reporting little "from an objective perspective." Id. The ALJ found that they did not demonstrate less than "intact cognitive functioning," because Plaintiff was able to discuss "current events, like the inauguration" during therapy. Id.

---

[3] In May 2016, Plaintiff discussed with his therapist his long history of addiction and "how hard it is to control his impulses." AR 659. Since his sobriety, he had replaced heroin with other addictive behaviors, such as "binging on the computer." Id.; see also AR 654 (discussing binge behavior and lack of impulse control).

[4] The ALJ actually cited AR 453 (a list of Plaintiff's medications) but apparently meant to refer to AR 449.

The ALJ ultimately gave "strong weight" to the opinions of consultative examiner Dr. D'Angelo, "some weight" to the state agency physicians, "some weight" to Dr. Ghazanfar's April 2016 assessment, and "less weight" to her March 2017 assessment.  AR 23-24.  The ALJ rejected all Dr. Ghazanfar's opinions in March 2017 that Plaintiff had "marked" limitations.  AR 24.

**B. Lay Witness Testimony.**

    **1. Summary.**

        a.  Larry Irvine Herbert.

Mr. Herbert testified that he had been friends with Plaintiff for seven or eight years; they had lived together for a while and saw each other three or four times a week at the time of the hearing in May 2017.  AR 72-73, 75.  He had observed that Plaintiff needed help with daily activities, and he assisted by taking Plaintiff shopping and to psychiatric appointments.  AR 72-73.  He testified that he would "kind of keep watch of him" because "sometimes he goes off."  AR 73.  When asked to clarify this testimony, Mr. Herbert explained that Plaintiff "gets disoriented" and "gets sick … from his meds."  Id.  He also described Plaintiff's periodic panic attacks.  AR 75.  Mr. Herbert accompanied Plaintiff to the hearing.  AR 76.

        b.  Steven Abeyta.

Mr. Abeyta completed a third-party adult function report in April 2016.  AR 214-21.  He reported that he had known Plaintiff for six years, visiting him twice a week to drive him to mental health appointments.  AR 214.  Mr. Abeyta observed that Plaintiff "takes meds morning, afternoon and night" and the medication "makes him sick and impossible to function."  AR 214-15.  Plaintiff was often "confused" because his medication schedule was "always changing."  AR 216.  Mr. Abeyta also observed that Plaintiff had trouble with basic self-care, such as failing to bathe regularly, wash his clothes, or eat healthily.  AR 215.  He opined that Plaintiff could not handle money or count change.  AR 217.  Plaintiff went

outside daily, but always accompanied by someone else and only to medical appointments, support groups, or the store. AR 217-18. Mr. Abeyta observed that Plaintiff was "dizzy" and "easily runs out of energy," and he needed prompting and reminders to get ready for outings. AR 219-20.

### c. Brian Hayes.

Mr. Hayes completed a third-party adult function report in July 2016. AR 222-29. He managed the sober living group home where Plaintiff was living. AR 222. He had known Plaintiff for six years and observed him having "depressive episodes lasting a week and hypomania lasting several days." Id. These episodes were brought on by stress. AR 228. He, too, reported that Plaintiff would go "days without bathing" and never went out alone. AR 223, 225. With reminders, Plaintiff spent thirty minutes per day cleaning the bathroom, and he could handle his own money. AR 224-25. At that time, Plaintiff went to "AA/NA" (i.e., Alcoholics Anonymous and Narcotics Anonymous) meetings five times per week with a friend. AR 226. His medications made him drowsy. AR 229.

### 2. The ALJ's Evaluation of the Lay Witness Testimony.

Regarding these three witnesses, the ALJ found as follows:

> While I find Mr. Herbert's testimony essentially reliable concerning the type and degree of assistance he provides to the claimant, the medical data and cumulative opinion evidence does not establish a medical need or explanation for that level of involvement. For similar reasons, and because of subsequent improvement, I give minimal [weight] to the statements by friend Steven Abeyta and by a sober living facility house manager [Brian Hayes].

AR 24.

### C. The ALJ's Evaluation of the Vocational Testimony.

The VE testified that unskilled workers are typically off-task 7-9% of the time, and this does not preclude employment. AR 70. The VE also testified that

an unskilled worker who was off-task 15% of the time or more could not maintain employment.  Id.  Assuming a 40-hour workweek (or 160-hour work month), 15% would be equivalent to 6 hours/week (or 3 days/month), whereas 9% would be equivalent to 3.6 hours/week (or 1.8 days/month).  The ALJ concluded that Plaintiff could "sustain focus in a work setting matching" the RFC but accepted the VE's "additional testimony based on his experience/research that an individual can perform unskilled occupations even if he is off-task up to 7 to 9% of the time." AR 25.  The ALJ thus necessarily found that Plaintiff would not be off-task more than the average unskilled worker, i.e., 3.6 hours/week or 1.8 days/month.

## IV.

## DISCUSSION

### A. ISSUE ONE: The ALJ's Consideration of Plaintiff's Bipolar Disorder.

Plaintiff asserts that the ALJ erred by stating in her decision, "I do not find any continuous 12-month period during which the claimant was precluded from performing a modified range of substantial gainful activity."  (JS at 6, citing AR 18.)  Plaintiff contends that this misunderstands the nature of his mental illness, because his symptoms fluctuated over time.  (JS at 9, 19.)  Thus, while he sometimes functioned with only mild or moderate difficulties, at other times he had panic attacks or depression so severe he had difficulty getting out of bed.  His medications also changed over time, and their side effects fluctuated.  Sometimes he felt "zombie-like" sedation, extreme confusion, and too dizzy to stand in the shower.  (JS at 11, 22.)  Plaintiff contends that these symptoms, while not constant, are not adequately addressed by the RFC and thus preclude his sustaining fulltime work.  (JS at 9.)

To the extent Plaintiff contends that the ALJ erred at second step[5] of the

---

[5] The second step is: "If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement,

10

five-step evaluation process, Plaintiff makes no showing of prejudice.  Even

assuming ad arguendo that the ALJ erred at this step, she proceeded past it.

Plaintiff recognizes this (see JS at 6 ["(although she does, as will be seen below,

continue the sequential evaluation")]), and he therefore makes no showing of

prejudice.  Moreover, the ALJ found no twelve-month period during which

Plaintiff was precluded from performing a modified range of *substantial gainful*

*activity*—not that his bipolar disorder had not lasted or could not be expected to

last a continuous period of twelve months (i.e., the relevant inquiry at the second

step).  Therefore, the ALJ's finding does not appear to address the durational

requirement of the second step.

The Court understands the ALJ to be saying that even if Plaintiff's bipolar

disorder rendered him unable to work during the month when he was hospitalized,

his symptoms subsequently improved sufficiently to allow him to do work

consistent with the RFC.  To the extent Plaintiff contends that the ALJ erred by

finding that Plaintiff could sustain fulltime work, so long as that work was limited

as described in the RFC, that contention is addressed in the discussion of Issues

Two and Four.

## B. ISSUES TWO and FOUR: The ALJ's RFC Determination.

In Issue Two, Plaintiff contends that the ALJ's RFC determination lacks

substantial evidentiary support.  (JS at 21-26.)  In the related Issue Four, Plaintiff

contends that the ALJ's finding at step five of the sequential evaluation process

(i.e., that Plaintiff can sustain fulltime work if its demands do not exceed the RFC)

also lacks substantial evidentiary support.  (JS at 35-37.)

Plaintiff cites Social Security Ruling ("SSR") 85-15 which discusses how to

---

we will find that you are not disabled."  20 C.F.R. § 404.1520(a)(4).  The
durational requirement is: "Unless your impairment is expected to result in death, it
must have lasted or must be expected to last for a continuous period of at least 12
months."  20 C.F.R. § 404.1509.

evaluate the impact of mental illness on vocational opportunities, as follows:

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work.  The basic mental demands of competitive, remunerative, unskilled work include the abilities (***on a sustained basis***) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.  This, in turn, would justify a finding of disability …

SSR 85-15 (emphasis added).  Work on a "sustained basis" means "8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p.

Thus, the Court understands both Issues Two and Four to be challenging the ALJ's finding that Plaintiff would not be off-task more than the average unskilled worker.  The ALJ's key determinations leading to that finding were (1) rejecting the marked limitation opinions in Dr. Ghazanfar's March 2017 assessment, and (2) seeing "little" complaints after December 2015 of side effects that might cause Plaintiff to be off-task more than the average unskilled worker.

### 1. Dr. Ghazanfar.

Dr. Ghazanfar's March 2017 assessment found that Plaintiff would have "marked" limitations completing a normal work schedule (i.e., working on a sustained basis), because his anxiety and depression made it difficult for him to tolerate ordinary stress and persist in completing tasks, even simple tasks like self-care.  AR 505-12.  The ALJ gave four reasons for rejecting these opinions: they were (1) inconsistent with her April 2016 assessment, (2) inconsistent with Dr.

D'Angelo's opinions, (3) unsupported by objective data, and (4) inconsistent with records showing improvement. AR 24. As discussed below, none are specific, legitimate reasons supported by substantial evidence.

 a. <u>Reason One</u>: Inconsistent with April 2016 Assessment.

Dr. Ghazanfar's two assessments address many of the same functional areas, as follows:

| Functional Area | April 2016 | March 2017 |
|---|---|---|
| Understand and remember simple instructions | No obvious problems with memory or concentration (AR 300); is able to understand simple instructions (AR 302) | Not significantly limited (AR 505) |
| Carry out simple instructions | Able to follow simple instructions (AR 302) | Not significantly limited (AR 505) |
| Focus for extended periods | Able to keep/sustain focused attention during visits, but trouble completing tasks requiring more time, such as cooking and cleaning (AR 302) | Markedly limited (AR 505) |
| Perform hygiene tasks | Able to care for basic hygiene needs (AR 301) | Fair hygiene (AR 507) |
| Perform activities of daily living | Not really able to cook or clean (AR 302) | Struggles to complete activities of daily living (AR 510) |
| Respond to ordinary workplace stress | May or may not be able to adapt to stresses common to the work environment secondary to mood dysregulation (AR 302) | Markedly limited (AR 506); cannot respond appropriately to work pressure (AR 512) |
| Regulate moods | Mood dysregulation (AR 302) | Persistent disturbance in mood (AR 509) |
| Interact with the public | Able to interact appropriately with others at sober living facility (AR 302) | Not significantly limited (AR 506); "slight" difficulty maintaining social functioning (AR 511) |

13

| Interact with co-workers | Able to interact appropriately with others at sober living facility (AR 302) | Moderately limited (AR 506); anxiety makes it hard for him to socialize at times (AR 511); cannot respond appropriately to co-workers (AR 512) |
|---|---|---|
| Respond appropriately to supervisor criticism | May not be able to handle criticism from supervisors (AR 302) | Moderately limited (AR 506); cannot respond appropriately to supervision (AR 512) |
| Control impulses | Severely impaired impulse control (AR 300) | Moderate difficulty maintaining appropriate behavior (AR 506); "impairment in impulse control" not checked (AR 510) |
| Use public transportation | Able to use public transportation (AR 301) | Moderately limited (AR 506) |
| Complete a normal work schedule and perform at a consistent pace | Plaintiff's report of "hypermanic episodes lasting 3-4 days" and "depressive episodes that last up to 2 weeks" (AR 299) | Markedly limited (AR 505); lacks persistence in completing tasks (AR 511) |

While there are some differences in these assessments (as one would expect after a year of treatment), they are largely consistent. Dr. Ghazanfar consistently opined that Plaintiff had the cognitive ability and attention span to do short, simple tasks, but had difficulty completing tasks that required focusing for longer than one therapy session, even unskilled tasks like cooking or cleaning. She consistently found that he could engage in superficial socializing but would sometimes respond inappropriately in social settings with more stress. She consistently attributed these functional impairments to his depression and anxiety. AR 302, 511-12.

The ALJ discredits the 2017 assessment as more restrictive, despite that fact that Plaintiff's symptoms generally improved over a year of treatment, and asserts that Dr. Ghazanfar failed to explain this "change for worse." AR 24. Ultimately, the two assessments are not so different (particularly on the critical issue of

Plaintiff's ability to sustain fulltime employment and not be off-task more than a typical unskilled worker) and even if they were, that difference would not be a legitimate reason for giving the first one more weight than the second, because the second one followed a longer period of treating history. Furthermore, as discussed in connection with Reason Four, the ALJ overstated the degree of improvement documented by the medical evidence.

b. <u>Reason Two</u>: Inconsistent with Dr. D'Angelo.

Dr. D'Angelo and Dr. Ghazanfar agree that Plaintiff can do simple cognitive tasks and get along with other people in superficial public settings. AR 468-69, 505-06. They also agree that Plaintiff's greatest difficulty is responding appropriately to stress; both gave Plaintiff their worst assessment in this area, although for Dr. Ghazanfar it was a "marked" limitation while for Dr. D'Angelo it was only a "moderate" limitation. AR 469, 506.

The two doctors significantly diverged when assessing Plaintiff's ability to maintain focus and complete work. Dr. Ghazanfar observed that Plaintiff could stay focused during their appointments but reported difficulty completing longer tasks, such that he had trouble cooking or cleaning. AR 505, 510-11. Dr. D'Angelo met with Plaintiff once, assessed his concentration skills by having him do tasks like spelling WORLD backwards and forwards, and concluded that Plaintiff had "no difficulties" focusing or maintaining attention, "no difficulties" in concentration, persistence or pace, and "no difficulties" working consistently. AR 468. He opined that Plaintiff would have only "mild" difficulty completing a normal work schedule. AR 469.

The mere fact that Dr. D'Angelo disagreed with Dr. Ghazanfar about whether Plaintiff could maintain fulltime work without greater-than-average absenteeism is not a legitimate reason to reject Dr. Ghazanfar's opinions in favor of Dr. D'Angelo's. Rather, giving Dr. D'Angelo greater weight would only be appropriate if his opinions were better supported (which they are not, as discussed

15

1     for Reason Three, below) or more consistent with the overall evidence.

2          Dr. Ghazanfar's opinions of Plaintiff's "marked" limitations are consistent

3     with the opinions of RN Upshur (which reports that Plaintiff lacks "coping skills"

4     to manage his symptoms in the work environment, causing him difficulty

5     "concentrating" on work tasks and completing an 8-hour day [AR 367]), the fact

6     that Plaintiff had never maintained a stable job (AR 310), Dr. Caracciolo

7     Magcalas's therapy session notes (which report significant struggles with binge

8     behavior, conflict with housemates, anxiety, depression, and fatigue [AR 513-51,

9     554-56, 561-66, 570-74, 581-86, 590-608, 612-13, 616-21, 624-30, 633-42, 645-

10    86]), and the observations of all three lay witnesses who knew Plaintiff for years

11    and believed that he needed help to complete basic daily activities.

12         Dr. D'Angelo's opinions are not more consistent with the evidence. Indeed,

13    the ALJ gave "strong weight" to Dr. D'Angelo's opinions despite finding that he

14    had significantly overstated Plaintiff's abilities; the ALJ found Plaintiff had

15    "moderate" difficulty maintaining concentration, persistence or pace, whereas Dr.

16    D'Angelo found "no" difficulty.  Compare AR 19, AR 468.

17              c.  Reason Three:  Lack of Supporting Objective Data.

18         The ALJ faults Dr. Ghazanfar for failing to supply supporting objective data.

19    Mental illness is not susceptible to the same forms of objective measurement as

20    physical illness, such as X-rays or blood tests.  See Thompson v. Astrue, No. ED

21    CV 09-2255-PLA, 2011 U.S. Dist. LEXIS 5229, at *26 (C.D. Cal. Jan. 19, 2011)

22    (holding ALJ erred in rejecting opinions of treating psychiatrists as "not

23    sufficiently supported by objective findings" because, "when mental illness is the

24    basis of a disability claim, clinical and laboratory data may consist of the diagnoses

25    and observations of professionals trained in the field of psychopathology.  The

26    report of a psychiatrist should not be rejected simply because of the relative

27    imprecision of the psychiatric methodology …"); see also Jacka v. Colvin, No. CV

28    12-7188-PLA, 2013 U.S. Dist. LEXIS 93003, at *24 (C.D. Cal. June 25, 2013)

(holding that "regular, personal observations of plaintiff over a 13-month period" constitute objective evidence because "when mental illness is the basis of a disability claim … clinical and laboratory data may consist of the diagnoses and observations of professional psychiatrists and psychologists.") (quoting Hartman v. Bowen, 636 F.Supp. 129, 132 (N.D. Cal. 1986)).

Dr. Ghazanfar included her own observations (e.g., Plaintiff appeared "tense and high-strung"), had access to the therapy notes of her colleague, Dr. Caracciolo Magcalas, and included Plaintiff's reports of his own symptoms and mental status. AR 507-12. While Dr. D'Angelo describes some brief objective testing (like spelling WORLD), substantial evidence does not support the conclusion that Dr. D'Angelo's opinions have better objective support than Dr. Ghazanfar's.

d. <u>Reason Four</u>: Inconsistent with Improvement.

There is no doubt that Plaintiff's condition improved between November 2015 (when Heritage Oaks Hospital found him a danger to self [AR 286]) and December 2015 (when Heritage Oaks discharged him [AR 268-69]). Between Dr. Ghazanfar's 2016 and 2017 assessments, however, treating records do not show steady improvement. Rather, Plaintiff alternated between periods of increased and decreased symptoms. See, e.g., AR 606, 619, 624 (in August 2016, reporting feeling worse, numb, unable to process ideas, and suicidal thoughts); AR 600 (in September 2016, reporting feeling hopeless); AR 578 (in October 2016, reporting reduced sense of alienation); AR 549, 554, 561-67 (in November 2016, reporting his depression had "gotten worse" and he had "never dealt with depression to this extent"); AR 522 (in January 2017, reporting "I have hope now"); AR 513 (in February 2017, reporting feeling "depressed and too medicated").

In any event, there is no inherent inconsistency with experiencing some improvement (for example, finding a combination of medications that is effective with fewer side-effects, improving sleeping habits, and learning new coping skills) while still having marked limitations in the areas of tolerating stress and sustaining

a fulltime work schedule.  See, e.g., Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001) ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws.  That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

## 2. The Effects of Treatment on Absenteeism.

The ALJ noted, "subsequent to the [Plaintiff's] discharge from the hospital in December 2015, we find little in the way of complaints of medications side effects."  AR 22.  The medical evidence from the Los Angeles County Department of Mental Health, however, shows as follows:

• 02/09/16: Plaintiff reported that he gets "nauseated, gassy, and constipated from his medications."  AR 332.  The medications help him fall asleep, but Depakote makes him hungry.  AR 333.

• 02/16/16: Plaintiff did not "report any untoward side-effects" from Depakote, but he was still trying to taper off the drug.  AR 329, 410.  A treatment goal was to "[m]onitor [his] symptoms and side effects and make changes to medications appropriately."  AR 330, 410.

• 03/10/16: Plaintiff denied "any side-effects of his medications," which by this time included a reduced dosage of Depakote.  AR 324, 326, 335.  He reported, however, that he had experienced a "hard month" after the medication change left him feeling more depressed and anxious with changes to his sleeping and eating habits.  AR 324.  His medications were adjusted again.  AR 326.

• 04/04/16: Plaintiff did not "report any untoward side-effects" from his medications.  AR 322, 501.

• 04/21/16: Plaintiff told his therapist that he was struggling with adjusting to taking mental health medications and still felt sometimes as if he were using heroin.  AR 673.  He reported as side-effects that they made him feel "sluggish,

18

apathetic, low energy." Id.

• 05/09/16: Plaintiff reported that Latuda gave him "very bad diarrhea," and that Latuda and Seroquel were making him "overly tired" in the morning such that he had trouble waking up. AR 494. Dr. Ghazanfar discontinued his Latuda prescription because of the reported side-effects. AR 496.

• 05/19/16: Plaintiff reported a "big change" in his medications, and he was having trouble adjusting because they were "so much stronger." AR 662. He felt fatigue and low energy. Id.

• 06/08/16: Plaintiff reported that he had added Celexa to his medication regimen and it made him "feel more energetic." AR 657.

• 06/16/16: Plaintiff reported he was unsure if his "medication or depression was causing his fatigue and low motivation." AR 654. He now reported that Celexa made him fatigued. Id. He recognized the value of medication for stabilizing his moods, but he was "having a hard time getting use to the secondary effects." Id.

• 06/23/16: Plaintiff reported that he was "having a hard time telling the difference between SA [perhaps social anxiety] and medication." AR 651. He further reported that while the medication was reducing his manic symptoms, it also caused him to be less "proactive." Id.

• 07/11/16: Plaintiff reported that he stopped taking Trazadone because it sedated him, but he still awoke feeling anxious. AR 486. He also reported that Celexa was causing constipation. Id.

• 08/01/16: Plaintiff reported that Celexa was making him "more nervous and manicky." AR 475.

• 09/26/16: Plaintiff complained to Dr. Ghazanfar that Lamictal was making him "really tired," but he denied other medication side effects. AR 470.

Plaintiff visited Exodus in January, June, and July 2016. AR 448. At the time of the first visit, he was taking Depakote, Buspar, and Seroquel. AR 448,

461. He reported feeling manic with racing thoughts and decreased sleep, and Exodus staff observed his speech was "slightly rapid, slightly press[ured.]" AR 461. Exodus added "Vistaril for sleep" to his medications. Id. Exodus also increased his dosage of Seroquel and warned him that his medications could have serious side-effects including drowsiness, constipation, and dizziness. AR 463.

At his second visit in June 2016, Plaintiff reported a generally "good response" to the medication change with "↓ [decreased] anxiety" but also "↓ mood" and "depressed." AR 454. The record also appears to say "øSE," meaning he reported no side effects. Id. Exodus noted "no significant changes" to Plaintiff's mental status or physical condition but checked a box indicating, "Services are needed to maintain community functioning/unable to wait for regularly scheduled visit." Id. Exodus discontinued Depakote and Vistaril, decreased the dosage of Buspar, and started him on Celexa. AR 449, 454.

At his third visit in July 2016, Plaintiff reported "mood stable, good sleep" over the past month, but "slight ↑ in anxiety after dosage of Buspar was ↓ last time." AR 449. Plaintiff also reported "fair – moderate" improvement in his depressive symptoms. Id. He reported mild constipation in the form of going to the bathroom every other day rather than every day. Id. Exodus advised him to "monitor for ↑ constipation ć [with] ↑ Celexa." Id.

In November 2016, Plaintiff reported that a new medication was causing "interruptions in his behavior" and he was "struggling" with the medication adjustment. AR 564. In February 2017, Plaintiff reported feeling "too medicated." AR 513.

These records cannot be fairly characterized as containing little evidence of Plaintiff complaining about medication side effects.[6] To say a patient reported no

---

[6] Per the Commissioner, Plaintiff made "one complaint of constipation and two reports of fatigue, but indicated he exercised to counter-act the effects." (JS at

"untoward" side-effects is merely to say that the patient reported no unexpected or unusual side-effects; it does not mean that Plaintiff experienced no or insignificant side-effects, since Plaintiff's cocktail of psychotropic medications has significant expected and usual side-effects. AR 463.

The RFC accounts for some medication side-effects (like dizziness) by restricting Plaintiff against climbing and working with "moving mechanical parts." AR 26. The ALJ's only accommodation for drowsiness and lethargy, however, was to solicit VE testimony that a typical unskilled worker is off-task up to 9% of the time, or 1.8 days/month. AR 70.

During the period of claimed disability, Plaintiff was spending hours each month obtaining treatment for his bipolar disorder. In February 2016, he started weekly psychotherapy sessions. AR 413. He sometimes saw his therapist more than once a week. AR 61, 546 (recommending seeing social worker twice weekly to address depression). Many of these therapy sessions were lengthy and scheduled during normal working hours. See, e.g., AR 546-47 (on Wednesday, November 30, 2016, Plaintiff spent 78 minutes with his therapist, and his next scheduled appointment was for Friday, December 2, 2016, at 2:00 p.m.); AR 513-14 (on Friday, February 15, 2017, Plaintiff spent 72 minutes with his therapist, and his next scheduled appointment was for Wednesday, February 10, at 12:00 p.m.). In addition to therapy, he also saw Dr. Ghazanfar about every two months for medication management and attended 12-step meetings or group classes weekly. AR 37-39, 466, 571. Plaintiff's counsel argued that this treatment "takes up a couple of days a week." AR 76-77.

Considering that (1) Plaintiff's treating records indicate that he episodically suffers from severe depressive symptoms that impair his ability to get things done (such as even getting out of bed or showering [AR 366]), (2) a known side-effect

27.) This, too, fails to characterize the AR accurately.

of Plaintiff's medications is drowsiness, of which Plaintiff has complained (AR 229, 654, 662), (3) Plaintiff's symptom management is attributable to an intense schedule of therapy sessions and medical appointments (summarized in the preceding paragraph), and (4) Plaintiff has been counseled to "take time out" and practice "relaxation techniques" such as "mindfulness" meditation when he feels overwhelmed by stress (AR 408, 546, 555), substantial evidence does not support the ALJ's finding that Plaintiff would be absent from work or off-task 9% of the time or less.[7]

## C. ISSUE THREE: Lay Testimony.

### 1. Rules Governing the ALJ's Evaluation of Lay Testimony.

In determining how impairments affect a claimant's ability to work, lay witness testimony by friends and family members who have had the opportunity to observe the claimant "constitutes qualified evidence" that the ALJ must consider. Sprague v. Bowen, 812 F.2d 1226, 1231-32 (9th Cir. 1987). The ALJ may discount the testimony of lay witnesses only for "reasons that are germane to each witness." Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

### 2. Analysis of Claimed Error.

Plaintiff contends that the ALJ failed to give a germane reason, supported by substantial evidence, for discounting the testimony of the three lay witnesses. Plaintiff argues that in the context of assessing mental illness, it is illogical to discount friends' observations of how he actually functioned just because there is no objective medical evidence corroborating the degree of impairment they observed. (JS at 30, 35.) To do so is tantamount to rejecting their testimony

---

[7] See, e.g., Bartrom v. Apfel, 234 F.3d 1272 (7th Cir. 2000) (where plaintiff experienced periodic depression, which her doctor opined prevented her from working on a sustained basis because it recurred at times of stress, holding that ALJ's finding that plaintiff could maintain steady employment was not supported by substantial evidence).

categorically just because they are not medical sources, which the regulations prohibit. (Id.)

The Commissioner argues that inconsistency with the medical evidence is a valid and germane reason for discounting lay witness testimony. (JS at 32-33, citing Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).) The ALJ, however, did not clearly identify an inconsistency, and the Court cannot affirm based on an inconsistency that was never identified. If the ALJ intended to say that the lay witnesses' testimony was inconsistent with Plaintiff's post-hospitalization improvement, then that reason lacks substantial evidentiary support because (1) the medical records do not show steady improvement of his relevant symptoms, as discussed above, and (2) the lay witnesses all interacted with Plaintiff after his hospitalization.

## V.

## CONCLUSION

District courts have discretion to remand a case either for additional evidence and findings or to award benefits. Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996). Courts should only remand for an award of benefits where further administrative proceedings would serve no useful purpose. Id.

Here, further administrative proceedings are required to determine whether Plaintiff was disabled for part of all of his claimed period of disability. On remand, the ALJ should make findings as to how much time Plaintiff is likely to be absent from work or off-task considering his therapy schedule, medication side-effects, continuing bipolar symptoms, and potential need to take breaks to cope with stress. If that degree of lost work does not preclude employment, then the ALJ should consider whether it significantly erodes the number of available positions. If Plaintiff is found disabled, then the ALJ will need to consider the impact (if any) of Plaintiff's history of substance abuse.

For the reasons stated above, IT IS ORDERED that judgment shall be

entered REVERSING the decision of the Commissioner and REMANDING for further administrative proceedings consistent with this opinion.

DATED:  August 08, 2019

_____
KAREN E. SCOTT
United States Magistrate Judge